Good morning, Your Honors. May it please the Court, I am Kenneth Larkin Vanderhoff. On behalf of the petitioners, I intend to reserve two minutes of my time for rebuttal, and I'll keep an eye on that clock. Before the Court today is whether the petitioners suffered past persecution, whether they have established a well-founded fear of future persecution, and which evidentiary standard applies to the finding of whether or not past persecution was established. The petitioners here did in fact suffer past persecution. The petitioner's uncle fired a gun at petitioner's home while yelling at him, indicating he knew or believed him to be in the home on at least five occasions. He separately threatened, the same family member threatened him, the petitioners, and the same family member physically beat the petitioner's father. The petitioner here was found credible by the immigration judge, and so his testimony is accepted as true. This Court is well aware of the litany of cases that have grappled with what exactly constitutes persecution. It has found that threats alone can be persecution. Were the, so this is the, the harm, I guess, was the shooting at the house. Yes, Your Honor. To these petitioners, it would be psychological harm. Yes. Now, as I read the record, I thought the board may have mischaracterized actually what happened. Did the shooting take place in the house or outside the house? The shooting took place, the shooter was outside the home shooting at the home. Was he ever in the house? No, Your Honor. That's not the way I read the testimony. What I, the testimony in both the petitioner's written statement and his testimony was, I will admit, was in the back and forth and testimony before the immigration judge was a I don't know the record to show anywhere that the shooter was inside of the home, but rather outside the house. How did these events take place? How did they take place? The shooter. Did you come by and shoot him up? The shooter lived nearby. I think the record indicates he lived about 200 meters away from this home, and so he would come to the home to shoot at it. And the testimony is that the shooting and the threats and whatnot. And physical harm to the petitioner's father. His harm to the father caused him psychological pain? Yes, in particular, the harm. Yes, Your Honor, in particular, the shootings and the threat of imminent death during the incidents of shooting. Was it just that, was he in the house when the shootings occurred? He was. And was he aware of them or? He was, and he testified to, I believe he was asked before the immigration judge how he knew who it was who was shooting. He said because he saw him from from inside the home. OK, and the shootings took place over what period of time? I believe, Your Honor, the period of three plus years. OK. And so I just want to say that this court has held that threats can be compelling evidence of persecution when accompanied by violent confrontations, near confrontations and vandalism. That's Mashiri v. Ashcroft. So here we are not alleging that there is only empty threats, but rather threats where particular steps were taken to carry out those threats, namely shooting a firearm, which but for different circumstances could have resulted in serious bodily harm or death. And I also just note this court has held the absence of bodily injury is not necessarily dispositive that persecution can be psychological. At what point is the line drawn between that which is considered for substantial evidence and and then for error of law? It sounds to me like we're still discussing the facts. And if and if the BIA concluded factually that something in fact occurred, how do we disturb it or question it at this point? Yes, Your Honor, I think maybe I'll turn to the evidentiary standard because I think we it is our position that this is a question of law, whether these facts, this harm rises, a level of persecution is, in fact, a question of law which this can review de novo. And I know that the respondent in this case argues that it is the substantial substantial evidence standard. I will admit this case is a little unique to me, at least in my practice, and that the board, the agency here only touched the argument on persecution, past persecution and well-founded persecution. Whereas in some cases they will say in the alternative, if there were past persecution, in any event, we would find and go on to arguments of nexus and the other determinations that need to be made. That wasn't done here. And so we would say that we don't need we don't need to show that the record has substantial evidence compelling reversal, but rather this board, this court can review it de novo. The issue of whether particular acts here, which are not in dispute, the acts are not in dispute, whether they constitute persecution. And that's this court in Boer, Sedano, V. Gonzalez said that. So you're saying if we disagree with the board on past persecution, we have to send it back because they never made the nexus finding. Correct. Did they not accept the I.J.'s? They said that they didn't reach. Well, what I would say is they didn't. They expressly say they did not reach our arguments on appeal. And so as to the other issues, citing, but that was bad. And so I would say that if this court agrees that there was past persecution, then it should be returned to the agency to make a determination on those issues in the first instance. So when when the agency declined to address issues in the alternative, it remains open, then such that we would need to remand for further consideration if we if we reverse on the first question of past persecution. Yes, your honor. And it is their right to to not reach the other issues under the current law. But for that reason, yes, we would say that if past persecution or the persecution past and or future were to be reversed, then it should be returned to the agency. And if they had made those determinations and the alternative, what would you be arguing then today? Well, your honor, I think that does change the what standard would apply. I think there's many cases from this court that does say that when when dealing with the determination of asylum and withholding of removal eligibility, it is a substantial evidence standard. And I do think all of those issues would be before this court, meaning we would need to prevail on each of those issues in order for it to get remand. But here we are focused on the issue of persecution. So which case would you cite from the Ninth Circuit that shows that, you know, the shots that, you know, never hit anyone directed at a house proves that that's past persecution, because Sharma is the on point and seems to say it's pretty has to be pretty high. I do agree. I would draw the panel's attention to Mashiri, the Ashcroft, which from which I pulled the line, the site of threats are compelling evidence of past persecution. Their past persecution was found and it was a family where essentially the past persecution was death threats, violence against a family member, vandalism, economic harm and emotional harm, emotional trauma, excuse me. So it was viewed those things in the cumulative where it was determined to be past persecution. Is there any trauma here? I mean, besides what's what's the evidence of trauma? The petitioner testified to believing he was going to die when at the incidents when he was his home was shot upon by a family member. So our argument would be the trauma is the near death experience on five different occasions in his own home. You know, I'm just looking at my files here. And when I. Looked at the testimony at the hearing. Let's see here. I think it's on the father's record. Around certified administrative record 133. There's a question. It's the judge to Mr. Mateo Juan. Would he meaning, I guess the uncle. Like walk or drive by and do this shoot or would he come up to the house and do it? Mr. Mateo Juan to judge he came into our house. He threatened me and he shot his gun. So I read that. Suggesting that he, you know, he testified that the fellow came into the house. No. Is that wrong? That I misread that? Your honor, you do not misread that. I think what I would I'm not aware of, and I don't believe any interpretation was challenged at the time I would. Suggest maybe it was just the preposition of in as opposed to in front of is the discrepancy, but I would point to in the record of the client's written statement and his initial reasonable fear screening with the asylum officer soon after he arrived, and he has been otherwise consistent that he was not inside the home. The uncle, the uncle. Yes, I'm sorry, but the petition was inside the home. The uncle was outside shooting at the home from the outside. OK. All right. OK, I think we took up your time. I'll give you some two minutes for rebuttal. Thank you. Good morning and please support Richard Samperty on behalf of the Attorney General. So and your honor, I think I'll dispense for a second just to say I think the record pages start around pages one twenty nine to one thirty one. That's where you start to see those prepositions. And my friend on the other side is correct. What happens and by the way, I would also recommend the father's record record at page one sixty four. That's his declaration again, which has the same declaration saying they were shot at as noted in the red brief. That's where the petitioner or the sorry, the adult petitioner had mentioned that the roof of his home was damaged or sorry, the roof of the disputed home was damaged. An unfortunate reality in immigration court is that they're working. I mean, it's nothing as grand as this. In fact, it's worth eventually sometime going by and seeing a immigration court. They're very tight, close quarters. There is there is a digital recording system that goes on in place. I'm sure probably like this one, but not nearly as high tech. They contract out and the immigration judges are allowed to read to read their oral decisions once oral decisions are issued. In fact, that's why you may see sometimes what looks like the. The Microsoft Word where it's been at the strike and edited. Yes, they don't really get to read the transcripts. And so the people who are listening to the transcripts are doing their best to to convert that. And so if there's a question then as to the integrity of the transcript, the record or that which the the immigration judge recorded in their opinion, how do we how should we treat that so? That would first have to be raised to the board. The app, the litigant would raise the board and say this, for instance, this interpretation was incorrect. They can actually get a CD of their own recording of their own hearing. They can go to the immigration court and request that. And so they can go back and, for instance, if they say, oh, I had my own interpreter listen to this hearing and the court official interpreter, sorry, the contract interpreter interpreted this way. But we say that the the correct interpretation should have been this. They can raise that and present it to the board. So if this court has a question about the significant meaning behind one preposition over another, that's not something that we can take up on our own. It would not have been exhausted yet, Your Honor. And so it would have to be by raising it to the board and saying all of these acts elsewhere in the transcript, they should have been ends. And so if you don't alert the agency to those things going on first, the agency has to have the first crack at saying what we think, because, for instance, the agency could get that motion to reopen saying there was a transcript infirmity and they could then they might decide to say, well, now we're going to address nexus. Now we're going to address that the uncle was arrested six times. Now we're going to address that the father has gone back to the dispute at home. They would have that opportunity if they chose to do that. But we can't raise that for the first time here under the exhaustion statute. And, you know, if you read the context of this transcript, it does suggest he is outside. He's talking about how thin the walls are. Right. And in context, it makes more sense for him to be outside. Well, yes, Your Honor. In fact, actually, petitioners on counsel then would restate and I understand he shot at your home. So the effect on the listeners is in play as well. So you have the again, this is very tight quarters. And so I can appreciate that. It's it's funny. The immigration judge might be able to lean up out of his or her chair and almost shake hands with the witness in the witness box if the witness leaned up out of it. It's very tight. So they're all here. Let me ask you another question about this. You know, I mean, this does take place over about a two year period, right? Well, Your Honor, actually, it started in 2009 when he's first deported to Guatemala. So I should point out, by the way, the the other petitioner, the child petitioner in two thirty one was not alive for some at least. Yeah, he's one of the shooters. Right. She only comes in at the very. She's born twenty eleven. Yeah. So the last shooting is twenty twelve. And then the adult applicant stays there for another two years before he he leaves. So but so roughly from 2009 to 2012, we have five shootings, five arrests, one threat for a sixth arrest, and then two more years pass before the. Adult petitioner who is the you know, so why don't these acts rise to the level of persecution? I don't quite understand. Well, Your Honor, the fact we're talking about, you know, just threats, we're talking about shootings into the home, Your Honor, and it might have been very well a different result if, for instance, the applicant had said I was standing in my kitchen window and he saw me and I saw him raises and he missed, thankfully, and hit the hit the glass or hit the frame. The fact finder in this case didn't call it that way. And because we're dealing with with twelve fifty two before the standard before this court, it's a matter of it's not a matter of one person says the ball was fair. One person says the ball was foul. One person says the batter checked a swing. The other says the batter went around. It has to be that no other fact finder would have done what the fact finder here did. And that's a reason. Let me ask you, you know, just in thinking about this, would it make a difference? Let's let's hypothetically speaking, suppose it had been a government official that had done this, then there might have then there might be a claim that would would go on. Would there be persecution? Same thing, just as governor official shooting. Well, we have to decide about the nexus. If the government official was mad, I'm talking about the acts. I mean, again, it would be a call for the fact finder. I mean, depending on who the fact finder was, they might say, well, that has sort of an imprimatur that it's more of an official act because the government's doing it. Another thing that make it worse than. One fact finder, I mean, the act itself, one shooting a gun into a house and people get prosecuted, you know, well, they do get prosecuted and they get prosecuted for for instance, even like beating up a spouse, but not necessarily every beating of a spouse turns into rising the level of the. And by the way, I should note just to my friend and their side's point about DeNova review, for what it's worth, the Supreme Court is currently deciding this case right now in Urias-Oriana. They just had argument on December 1st. I don't have a case number, but it is Urias-Oriana. I was going to ask it just to confirm my understanding. Yes, it's on that exactly. Whether or not it's the nexus is DeNova. No, the whether we review persecution DeNova or for substantial evidence. So, yes. And if you followed the question and answer on there, it looks like they're going to say it's substantial evidence. At that argument, the government attorney sat down early. That's the only thing I can tell you about that about that case. I mean, apart from I'm not going to read into he leaves about what questions the justice asked. But so does that suggest we should wait? If we think we think that we prevail as the legal landscape stands right now, Your Honor, with with everything from dating back to Elias Zacharias to this court's decision, Brahmati Singh to the statute to Garland versus Ming Dai, we think we But if the court wanted to be triply sure, they just held argument on December 1st. We know they're going to be done by the end of June. And we suspect that this is not a big this is not one of their big cases. So maybe they'll get it out. We don't think this is going to be one of the cases that's announced on the last day of the term. That's that's not an issue that's around around the country. There's conflicting positions. Well, sure. And it was brought up, for instance, that with Wilkinson, with extreme hardship in the cancellation rule context, did someone suffer exceptional, extreme, unusual hardship? Or will they suffer that if if they have to return to their home country? That's a legal status. But the Supreme Court said Wilkinson, that is for sure, a deferential factual finding by the agency. So they might be anything can happen. They may they might be trading some new ground. And I'm not going to take these stuff, too. I agree. I'm sorry. They've surprised me with some of their rulings on that. I can ask one other question. Does the fact that the uncle appeared to be drunk at the times of the shootings, is that should that play into our calculus of whether or not it's persecution? We think it should, because it played into the calculus of the fact finder. And so, again, we're all trying to decide, would any other fact finder find as the fact finder did here? It's a powerful standard because we're dealing with with review of facts. It's almost like trying to overturn a jury verdict. Could any other jury have reached this this verdict that we don't touch it? Right. And so how would that tease out what it makes it less persecuting because he was drunk? Well, it may have been whether there was sufficient intent. I mean, again, the roof is damaged. So if it's a matter of he's trying to fire the gun in the air to sort of be sort of menacing over the course of years to say, I want that house get out. If the fact finder thought this is this is the an uncle who, by the way, was 70 at the time of the trying to who if they don't live in that house, he's not doing a thing. He wants the house because the uncle, the brother of the uncle, where is the question? Their father left left it to the wrong brother. And so the fact finders looking at all these facts, making a call, fair or foul, check to swing or run around. And we're saying that it's not the case that any other that every other fact finder would have done the opposite of the one here. If DeNovo review was was exercised, how would the case be different, if at all, for you? We wouldn't. We would think that even under DeNovo review, the case is defensible. But DeNovo review would require a change because right now the legal standard is substantial evidence. And so that's not changed. Not counting whatever may happen in Oriana or Arizona. And I see. I'm sorry. Go ahead. Finish. So not counting what the Supreme Court may do if they step in and say. Surprise that it's all DeNovo. We still think it's defensible because, again, the fact finders, the one on the ground, the trial level. Immigration judge is the one in that room listening to the case, considering all the factors, including whether he was drunk, whether the the father, the brother of the uncle, who's now returned to the home to move back in there. We would also point the court, as the agency also cited, the immigration judge cited at record page 185, there's that legal agreement that says the parties are going to respect each other physically and morally. It's written right into the agreement on record page 185. So whatever's happening with with the dispute over the House, the fact finder was enough to say, we think even under DeNovo. You know, it's core for me. What's always been core to whether or not somebody suffered persecution was the nature of the act, you know, the harmful acts that are in play. In other words, you know, a threat is different than a physical beating. Yes, your honor. And in this case, of course, again, there was no physical harm to any of the either of the applicants here. But the immigration judges daily, they see it's actually hard to put everything on a grid because the cases they see are so different and so varied every day with the claims change so much. And so they start to get a feel for whether it's a ball or strike. With your permission, of course, if we were to consider this question on DeNovo review, what I want to try to do is visualize how that would end up working its way through decision. Would we need to then also redefine the boundary of what what factually would satisfy the condition of persecution? I mean, is that also what we would have to be doing? I think it would be it's. It would be pulling a thread that might really become. We probably have to have some supplemental briefing on how to review factual findings DeNovo. I mean. Well, that sounds like, you know, it's the it's again, it's the ultimate question, which you're reviewing DeNovo, right? And the facts, I mean, you know, the facts are supported by the evidence or not. And then you look then you look at whether or not those facts constitute. Right. Persecution and persecution is the for me, it's like the harm. I mean, it's really no different than I don't know if you've ever done any Fourth Amendment work, but, you know, in a motion to suppress, you look at all the facts, but ultimately the determination of whether or not there's been a violation of the Fourth Amendment is a legal question that we do. Well, your honor, that that touches a bit on what was going on in Wilkinson then, because, again, that that whether you have exceptional extreme hardship is a legal requirement. It's one of the elements for cancellation of removal. I realize we've gotten this is a some case, but but that's one of that's a legal standard. But when the Supreme Court consider that in Wilkinson, they said all the ingredients that go in all that fact finding makes it a deferential substantial evidence, factual finding review. So still trying to answer just a question. I'm with the DeNovo standard, but that certainly a reasonableness would have to be included in within that. But but then we would then be required in some way as a court to issue guidance about a different definition or what what minimum factual basis would be necessary to establish persecution. It might require this court to do more fact finding at this level, which, of course, it shouldn't do. Or we would redefine the parameters and the remand to to to the agency for further fact finding. Presumably that might be one if it was going to be DeNovo the whole way. OK, thank you very much, counsel. Thank you. Your honors, I just have a couple of very quick points I'd like to say. Staying on the topic of DeNovo review versus a substantial evidence. Again, this may be decided for us at some point in the future, near future. I would just say the current law of this circuit is that it is the whether certain harms rise to level persecution is not a factual question. And I think there was some talk about what if it becomes a factual question. We don't know what the Supreme Court may do and how that might affect this case. But the current law is that it's not a factual question. And this court in Boer Sedano said that whether particular acts constitute persecution is a legal question. So depending on how the Supreme Court might rule in this case, whether they say all factual questions are or however they break it down, it won't necessarily change the law of this circuit. I just wanted to make that point. And then as to the discussion surrounding the acts, the acts of harm, the shootings at the home, I think the whether he was inside the home or not, I think we've more or less settled as best we can given the transcript that we have. I would say whether or not the uncle was drunk at the time he did it to my eyes does not change. It does not change the potential result of the shootings. The gun is still being fired. Yeah, I think it could impact on intent. Like, you know, he's not doing it with like a steeled purpose. He's just doing it because he's drunk and trying to show off or scare, you know, but not like he doesn't have form the real intent to harm them. Understood. I think the record establishes that this uncle, as was mentioned earlier, wanted the home that the petitioner is living in. So I think he's stated his intentions of his disagreements that he has with the petitioners. And so whether the having whether alcohol influenced his decision to fire a gun or not, it was still put the petitioners in at the risk of imminent harm or death. And we would argue that rises to the level of persecution. Thank you, counsel. Thank you both for your excellent argument.
judges: PAEZ, BUMATAY, Kasubhai